**MIDDLETOWN** (city) **v CITY COMM.**

Common Pleas Court, Butler Co

Decided August 24, 1939

Fred J. Schatzman, Middletown, for plaintiff.

C. W. Elliott, Middletown, and B. F. Harwitz, Middletown, for intervenor Miller.

James W. Huffman. Columbus, for Middletown Retail Merchants Assn., amicus curiae.

Peck, Shaffer, Williams & Gorman, Cincinnati; Ernst, Cassatt & Cottle, Cincinnati, and Calvin S. Weakley, Cincinnati, for intervenor The Cincinnati Gas & Electric Co.

Thomas M. Miller, Columbus, for defendants.

## OPINION

By McDOWELL, J.

This action was instituted by the city attorney of Middletown, Ohio, on behalf of said municipality, against the city commission of Middletown, the members of said commission, the auditor of said city, and Van Lahr, Doll & Isphording, Inc., seeking to enjoin the issuance and sale of certain bonds in the amount of $1,800,000.00, purporting to have been authorized by an ordinance numbered 2237 and adopted by said city commission on the 18th day of November, 1938, and to enjoin permanently said defendants and each of them from carrying out the provisions of said ordinance and a contract provided therein.

The facts, according to the evidence introduced, including stipulations of the parties, are very briefly as follows:

The city of Middletown has a charter form of government. Its governing body is termed the city commission, which is composed of five members elected by the people. They employ a city manager and a city attorney, both of whom serve in their respective capacities for a term during the pleasure of the city commission.

On the 18th day of August, 1938, the city commission adopted the following ordinance:

### ORDINANCE No. 2226

An Ordinance Declaring It Necessary For The City of Middletown, Butler County, Ohio, to Construct or Purchase a Municipal Electric Light and Power Plant Together With All The Necessary Equipment Therefor, Including the Acquisition of The Necessary Land.

BE IT ORDAINED by the City Commission of the city of Middletown, Butler County, Ohio:

Section 1.

That it is necessary for the city of Middletown, Butler county, Ohio, to

construct or purchase a municipal electric light and power plant consisting of works for the generation and transmission of electricity and equipping the same, including transmission and distribution lines for supplying electricity to the city of Middletown, Ohio, and the inhabitants thereof including the acquisition of the necessary land therefor.

### Section 2.

This ordinance shall take effect and be in force from and after the earliest period allowed by law

Chairman of the City Commission.
Adopted: —————
Attest: —————

On the 18th day of November, 1938, the city commission adopted Ordinance No. 2237, which is the subject of the attack in this action, authorizing the issuance of $1,800,000.00 mortgage revenue bonds of the city of Middletown, Ohio, under §12 of Art. XVIII of the Constitution of the State of Ohio, for the purpose of constructing or purchasing a municipal electric light plant, together with all the necessary equipment therefor, including the acquisition of the necessary and; to provide a franchise to take effect in event of foreclosure of said mortgage and to declare an emergency.

This ordinance was passed as an emergency measure, (Section 15), providing that the same should go into effect immediately upon its adoption and publication. Publication was made on the following day: November 19, 1938. In the interim between the passing of these two ordinances, the city commission adopted many ordinances and resolutions, among which was legislation for the issuance of general obligation bonds to finance the project, submission of question of issuing such bonds to the electors, etc. All legislation concerning the issuance of general obligation bonds and calling an election was repealed by said commission on the 13th day of October, 1938.

It is contended on behalf of the plaintiff and intervening petitioners that the "Uniform Bond Act" is applicable in this case and that Ordinance No. 2237 is unconstitutional and void by reason of the emergency clause purporting to make it effective one day after its passage.

The defendants claim that the Uniform Bond Act has no application to mortgage revenue bonds issued under Art. XVIII, § 12 of the Constitution, and that Ordinance No. 2237 adopted by the commission on November 18th, 1938, not being an "initial" ordinance, is not subject to referendum.

Thus, two principal propositions of law are presented to this court for consideration.

It must be admitted that legislation for issue and sale of mortgage revenue bonds by the city commission certainly does not comply with the Uniform Bond Act. On the contrary, the Uniform Bond Act is utterly disregarded. The bonds are term bonds instead of serial bonds; they are to be sold at less than par, at private sale, and without advertisement. Thirty months' interest is capitalized by the terms of the ordinance and included as part of the cost of the project, and the bonds are subject to call and redemption prior to maturity at more than par and accrued interest. These provisions are in direct conflict with the Uniform Bond Act, hence if the Uniform Bond Act is applicable, there must be little doubt that the legislation with reference to the issue of bonds in this case is illegal and invalid and that the bonds sought to be issued thereunder are unauthorized and void, providing, of course, that such applicable provisions do not contravene or come in conflict with the Constitution of Ohio.

Numerous cases have been cited by counsel which they contend support their respective claims. We have examined all of them available, and, in addition, many others, and while these cases do have a bearing upon the matter, or some phase thereof, none of them, in our opinion, is determinative of the particular matters at issue. In each case it seems the facts or cir-

cumstances differ more or less from those in the instant case, and our state constitution is not an exact duplicate of that of any other state. So, we are therefore compelled to "break ground" in the determination of the matters here involved, and in so doing we may commit error, but if so, all concerned may have some consolation in the fact that the higher court will promptly correct that error.

The provisions of the Home Rule Amendment under which defendants claim authority to act, are §§4, 5 and 12 of Art. XVIII.

Sec. 4 provides:

"Any municipality may acquire, construct, own, lease and operate, within or without its corporate limits, any public utility, the products or service of which is, or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service * * *."

Sec. 4 above is the power conferring provision. It specifically authorizes construction, acquisition and municipal ownership.

Sec. 5 provides:

"Any municipality proceeding to acquire, construct, own, lease or operate a public utility, or to contract with any person or company therefor, shall act by ordinance, and no such ordinance shall take effect until after thirty days from its passage. * * *"

Sec. 5 is procedural and prescribes the method for the exercise of the power conferred by Sec. 4.

Sec. 12 of Art. XVIII provides:

"Any municipality which acquires, constructs or extends any public utility and desires to raise money for such purposes, may issue mortgage bonds therefor, beyond the general limit of bonded indebtedness prescribed by law; provided that said mortgage bonds issued beyond the general limit of bonded indebtedness prescribed by law shall not impose any liability upon such municipality, but shall be secured only upon the property and revenues of said public utility, including a franchise stating the terms upon which, in case of foreclosure, the purchaser may operate the same, which franchise shall in no case extend for a longer period than twenty-one years from the date of sale of such utility and franchise on foreclosure."

Sec. 12 provides the manner and method of raising money to finance a project authorized and permitted under Sec. 4, and this is the method which the defendants have elected to follow in financing the project in question, and in so doing, they claim to exercise plenary powers conferred direct by the constitution, unlimited and unrestricted by any section of the Uniform Bond Act.

The question naturally arises at this point as to whether these constitutional provisions under and by virtue of which defendants propose to proceed are self executing.

Sec. 5 is held to be self executing, requiring no assistance of statute to give it effect and operation."

State ex rel City of Toledo v Weiler, 101 Oh St 123.

"No legislative act can in any wise modify or restrict the power conferred by constitutional provision, and therefore any provision of the statute inconsistent with the constitutional provision conferring such power must fall."

Link v Public Utilities Commission, 102 Oh St 336.

One of the principal tests in determining whether a constitutional provision is self executing is the intention, and to determine intent, the general rule is that courts will consider the language used, the object to be accomplished by the provisions and the surrounding circumstances. If the constitutional provisions merely indicate a line of policy or principles, without supplying the means by which such policy or principles are to be carried

out, or if the language is directed to the legislature, or if it appears from the language used, or the circumstances of its adoption that subsequent legislation was contemplated to carry it into effect, it is then clearly not self-executing. On the other hand, if it be evident from the terms employed in any particular provision or the organic law that it shall go into force forthwith without awaiting ancillary legislation, it becomes an imperative judicial duty to thus declare it. Such duty, however, will become manifest only when the language employed is free from ambiguity, or when it is apparent, either from the language used, or from reasonable inference therefrom, or from other sources equally legitimate and accessible, where statutory and constitutional construction is involved, that the purpose of the given section will be frustrated unless immediate effect be accorded to its provisions.

The proceedings of the constitutional convention and the debates, while powerless to vary the terms of the constitution, are neverthless valuable aids in determining the purpose, the intent and the consequent meaning of doubtful provisions. Where the proceedings of a convention are to be examined, the history and conditions of the times, the evils that existed. requiring remedies, and the issues under consideration, may be consulted with profit. All such details tend to show the intent, as expressed in the work of the convention.

Prior to the constitutional convention of 1912, municipalities in Ohio derived their power almost entirely from the legislature. It was brought out in the convention debates that in order to widen or extend a street, and to perform most every other purely local function, it was necessary to go to the legislature to acquire that right. This, it was said, hampered the municipalities, curtailed their growth, and in general was very unsatisfactory, and, in heated debate, it was contended that the Home Rule Amendment should be "a real Home Rule Amendment", in substance and actuality and not in mere

form, and in discussing the various sections here under consideration, the purpose seemed to be to protect the municipalities from over-burdensome taxation, but beyond that they were given rather free rein in the acquisition of a public utility This is evidenced by a reply by Mr. Knight to a question of Mr. Kramer asking if it would not be better to limit the municipality in its ownership as to water and electric light supply. The reply was: "If we want to stand still, yes—if we want to cut off the field of municipal activity; but the majority of us are not of that opinion * * * the idea, as we believe, of the present time and the future and the thing desired by municipalities of the state of Ohio, is the opportunity, when they please, to go into the ownership and control and operation of public utilities, with the limitation upon the power to burden their people with taxes and debt, as indicated by the latter provisions of the proposal."

That these constitutional provisions are self-executing, there seems to be little doubt. This view is supported by ample authority: **Dravo-Doyle Co. v Orrville, 93 Oh St 236; Priest v Wapakoneta, 8 OO 435; Toledo v Weiler, 101 Oh St 123.**

Counsel for intervenor, however, states that "the mere fact that a constitutional provision is self-executing does not prevent legislative provisions supplementing, regulating, or providing the method of exercising the power therein granted." With this statement we must agree, but it is applicable only where the constitutional provisions themselves do not provide the manner and means and methods for exercising the powers therein conferred. Certainly, in these constitutional provisions, the method of exercising the power conferred is provided, and we do not understand that this view eliminates general obligation bonds or rejects in any degree the doctrine of State ex rel Toledo v Weiler, supra.

Quoting from this test case at page 123:

"The purpose to grant to the municipalities of the state, full and complete power with reference to the acquirement, ownership and operation of public utilities, was clearly manifested * * * by the express language of the constitutional amendments then under consideration and later adopted. The discussion * * * discloses a purpose to confer upon any municipality desiring to acquire, construct or extend any public utility, the power to raise money therefor by the issuance of bonds; and they made such power and authority subject only to such general limitations as the Legislature of the state might impose under **power conferred upon it by other provisions, particularly §13, Art. XVIII,** which provides that laws may be passed to limit the power of municipalities to levy taxes and incur debts for local purposes." (Emphasis ours).

Thus the constitutional provision itself provides for the limitation by the legislature when general obligation bonds are considered, or when debt is incurred, but according to the same authority, the Legislature is not thereby authorized to annul or curtail the power expressly granted by the constitution. It was not contemplated that any grant of power by the Legislature was essential, nor that it should be permitted to deny or limit the purpose, but only to prescribe the limitation of taxes and indebtedness for all local purposes. If the Uniform Bond Act is to be applied in every case where bonds are issued, then we are forced to the conclusion that the powers granted in the constitution to issue mortgage revenue bonds, under §12, Art. XVIII, are not only regulated, curtailed and limited, but in effect, are completely destroyed.

It is insisted, however, that the issuing of mortgage revenue bonds under **§12, Art. XVIII, of the Constitution,** does create an indebtedness; that the words "beyond the general limits of bonded indebtedness" compel a consideration that they are indebtedness; that the granting of a franchise to take

effect upon foreclosure is a contract for operation of a utility and subject to referendum and that said franchise is valuable property the granting of which creates an indebtedness or imposes a liability; and it is urged that by reason of §6 of Art. XIII, and of §13, of Art. XVIII of the constitution, the Legislature is given power to regulate the method and manner of issuance thereof. We think the great weight of authority substantiates the claim that a debt is not thus necessarily created. In line with this authority is the case of **Kasch v Miller, Supt., 104 Oh St 281,** commented upon by counsel for intervenor as follows:

"An examination of this case (Kasch v Miller, Supt.), however, discloses that the decision turns on the fact that the revenues only, and not the property of the state, were pledged for the debt."

However we find in the syllabus of the above case that:

"* * * where the entire improvement is to be paid for by the issue and sale of bonds in the name of the state, and the principal and interest are to be paid entirely out of the revenues derived from the improvement, or **from the sale of the corpus** in case of default, a state debt is not thereby incurred within the purview of the state constitution * * *." (Emphasis ours).

In the opinion written by Judge Jones, we note the following on page 285:

"The owners of the bonds were given a lien on such improvements, and on certain default in payments thereon, they were authorized to foreclose their liens. The purchaser at foreclosure sale, under the provisions of the act, acquired the interests of the state and bond holders in the improvements for a period of twenty-five years, with the right to conduct water and power during that period over the lands, channels, etc. of the state."

Whether the lien referred to was in

the form of a mortgage or otherwise, it certainly embodied a greater right than to merely receive the revenues only. Counsel further quotes from the above case, page 289:

"* * * and Mr. Justice Cartwright, in the later case, distinguishes the principle involved, where he says, on page 463: 'What is said relative to mortgaging property owned by the city, or pledging its existing income, is not intended to apply to a mortgage purely in the nature of a purchase money mortgage, payable wholly out of the income of the property purchased, or by resort to such property.'"

Now, just what principle did Mr. Justice Cartwright distinguish in the "later case?" The later case referred to is the case of the City of Joliet v Alexander, 194 Ill., 457, 62 N. E. 862, and in this case I find the facts to be that the City of Joliet owned and operated a system of water works for the purpose of supplying the city and its inhabitants with water, and was deriving therefrom a net annual income of $10,000. It proceeded to pass legislation under a state statute. (and it might be noted here that in all of these Illinois cases which we have examined, the procedure is under statutory law, and not the constitution) to extend and enlarge their existing system and the ordinance provided for the issue of certificates to be secured by the revenue of the whole system, as well as the mortgage on the water works system and appurtenances, then owned by the city, as well as the extension to be constructed under the ordinance. Quoting from the opinion of Mr. Justice Cartwright, at page 86:

"In addition to mortgaging the existing system, the ordinance proposes to take the income now derived from it, amounting to about $10,000, a year, and devote it to the payment of the certificates. This is existing property and income of the city derived annually from the present system of waterworks, independent of the extension. * * * if

the city * * * can issue certificates, payable out of that fund without creating a debt, it would be equally within its power to issue obligations by pledging the fund derived from dramshop licenses, or licenses from hackmen peddlers * * *. Then follows the language quoted by counsel:

"'What is said (meaning above) relative to mortgaging property owned by the city or applying its existig income, is not intended to apply to a mortgage purely in the nature of a purchase money mortgage payable wholly out of the income of prpperty purchased, or by resort to such property.'"

Thus does Mr. Justice Cartwright distinguish the principle involved. The same principle was followed in the case of Lobdell v City of Chicago, 227 Ill., 218, as reflected in the language of Hand, J., on page 361:

"The city would lose * * * but would deprive it of many hundred thousands of dollars which would be paid into the treasury during that period. * * *."

In this case it is further held:

"If all that is proposed to be done in this case is to pledge the property and its income, which is purchased with the proceeds of said street railway certificates, when issued and sold, to secure the payment of said certificates, then, under the doctrine of Winston v Spokane, 12 Wash., 524, which has been approved in City of Joliet v Alexander, and village of East Moline v Pope, supra, there would be no indebtedness within the constitutional inhibition * * * ."

To be sure, a franchise is granted, which may become effective only upon default of the city and foreclossure of the mortgage, but this franchise can not be compared with that in the case of Lobdell v City of Chicago, supra, where the right to the use of the streets for railway purposes was granted, resulting in an enormous loss of revenue to the city and its inhabitants, which

revenue, at the time and before, was fixed and definite in amount. So far as the evidence discloses, the city of Middletown receives no income by reason of any existing franchise, nor would receive any income by reason of any future electric light and power franchise. That the franchise is of value to the grantee, can not be denied, but the value to the city, it seems to me, is in the form of service rendered under the contract, and that service, the city, of course, would receive, regardless of whom the grantee might be. Moreover, the constitution in the same section (Art. XVIII, Sec. 12), which provides that "any municipality may issue mortgage bonds therefor beyond the general limit of bonded indebtedness prescribed by law; provided that said mortgage bonds * * * shall not impose any liability upon such municipality, but shall be secured only upon the property and revenues of said public utility, including a franchise stating the terms * * *. specifically provides and directs the giving of a franchise, and in my opinion, the language in this section is the very best authority that a debt is not created, either by giving a mortgage, or granting a franchise in accordance with this section, for the simple reason that it so states in plain language: "Shall not impose any liability upon such municipality, but (and this little three-letter word becomes important because it refers to what immediately follows which shall be done, and refers back to the preceding words, 'shall not impose any liability'), shall be secured only upon the property and revenue of such public utility, including a franchise."

The constitution must be considered as supreme, and when a matter is specifically defined by the organic law, statutory enactments can not alter or change that definition. The evident purpose of the framers of the constitution in inserting Sec. 6 of Art. XIII, and Sec. 13 of Art. XVIII, was to effectively protect persons residing in municipalities from the abuse of their

credit, and the consequent oppression of burdensome taxation, but if Sec. 12, Art. XVIII is strictly followed no credit is extended. No liability attaches and no taxes can be levied; hence, these sections could have no application. It is not necessary to protect or limit that which does not exist.

It follows, therefore, that if the city commission had followed the section of the constitution (Sec. 12, Art. XVIII) under which they claim authority to act, the Uniform Bond Act would have no application nor would they be prohibited from issuing the bonds by any provision of the constitution.

But Sec. 12, Art. XVIII places a restriction upon the power and authority in §§4, 5 and 12 thus granted.

"* * * * provided that such bonds * * * shall not impose any liability upon such municipality."

If only the property to be acquired from the proceeds of the sale of the bonds and that from the revenue of the utility was included in the mortgage and a franchise granted in accordance with §12 above, the court would unhesitatingly say that no liability was imposed upon the municipality and no indebtedness created within the meaning of the constitution and hence the Uniform Bond Act is in no wise applicable. But the city commissioners apparently were not content in going thus far. They provided in the ordinance for "a mortgage deed upon all the property of said public utility now owned by the city and all such property acquired from the proceeds of said bonds, together with all extensions, betterments and additions to said public utility at any time made or acquired by the city during the time any of said bonds shall remain outstanding and unpaid * * *."

The bonds are made payable out of the gross revenues of said plant and system and all extensions, additions, improvements, replacements and alterations at whatever time made in respect thereto. There is no attempt or

effort to restrict the mortgage to property acquired from the proceeds of the bond issue and to revenue from such property so acquired but whatever extensions or betterments are made regardless of the source of revenue for that purpose are included in the mortgage as well as property now owned by the city of the approximate value of $70,000. It can not be seriously contended that extensions or betterments or replacements may not in the future be made from general funds or from funds the source of which may not be the property acquired from the proceeds of the sale of the bonds, but according to the ordinance and the bond provisions all extensions made by the city to the utility, all betterments and all replacements, whether from taxation or otherwise and regardless of when made or installed if the bonds are still in force the bondholders immediately acquire a lien thereon. We think a liability of the city of Middletown is thus created which is in contravention of the provisions of Sec. 12, Art. XVIII of the constitution.

It may be contended that extensions, betterments, etc., may never be made or that when made they will be made from the revenue of the existing plant but as stated by Judge Hart in the case of State ex rel v Griffith, 135 Oh St 604; 14 OO 533.

"But in determining the validity or constitutionality of any legislation, the court must consider what may or might happen under the legislative grant of power."

It is further held in this case (State ex rel v Griffith) when the proceeds of a bond issue is used to construct an addition to public property and the revenues of the entire property, old as well as new, is pledged to the payment of the bonds a debt or indebtedness of the state or muncipality is thereby incurred.

Sec. 13, Art. XVIII of the Ohio Constitution provides that laws may be passed to limit the power of munici-

palities to levy taxes and incur debts. Sec. 6, Art. XIII provides:

"The General Assembly shall provide for the organization of cities, and incorporated villages, by general laws; and restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent the abuse of such power."

Since we are convinced that a debt is incurred by the city of Middletown, a liability created, we are forced to the conclusion that the above provisions of the state constitution granting to the General Assembly the authority to restrict their (cities) power of contracting debts and loaning their credit and to pass laws limiting such power to incur debts becomes operative and an effective restriction and limitation upon the powers granted under §§4, 5 and 12 of Art. XVIII.

True Sec. 6, Art. XIII comes down from our constitution of 1851 but a number of cases hold that it is in pari materia with the "Home Rule" sections. State ex rel v Cooper, 97 Oh St 86; State ex rel v Bish, 104 Oh St 206; Berry v City of Columbus, 104 Oh St 607.

Not even this question can be raised as to Sec. 13, Art. XVIII. This section not only was adopted at the same time the Home Rule Amendment was adopted but is a part of it and explicitly controls the subject matter of municipal debts.

The city may levy taxes, extend its credit and incur debts but its power to do so is limited and in doing so it must bow to the sovereign power of the state and proceed in the manner and within the limitations provided by law. This the city of Middletown has failed to do.

Passing now to the second main question, whether Ordinance No. 2237, passed by the city commission on November 18, 1938, is subject to referendum, we are faced with the same difficulty by reason of lack of authorities directly in point. If the emergency fea-

ture of the ordinance was all that was being questioned, the difficulty would be considerably lessened, since the Supreme Court of Ohio has spoken definitely and unequivocally upon that subject, and it is now well established in this state that the legislative branch has exclusive authority to determine the existence of an emergency, and that the judicial branch has no duty or authority to interfere with the judgment so exercised. In other words, whether an emergency really did exist at the time the ordinance in question was enacted is not a subject for judicial inquiry. State ex rel v Kennedy, 132 Oh St 510; 8 OO 494.

Counsel for intervenor, Miller, concedes this to be the law, but makes the further observation that sooner or later these decisions will be overruled. Our answer to this is simply that we do not consider it either our duty or privilege to anticipate what the Supreme Court will in the future hold, but rather to interpret and give force to the law as we understand it to be now established.

Objection was made to the introduction of evidence as to the emergency feature, which objection was taken under advisement by the court. Since the court had no authority to inquire into the sufficiency of the reasons, as set out in the emergency clause, any evidence thereon is incompetent, and the objection is therefore sustained, and the testimony introduced over the objection will be stricken from the record.

Disposition of the question of the emergency feature, however, by no means obviates further consideration of the referendum question. Counsel for the commission relies principally upon the case of State ex rel Didelius v City Commission of Sandusky, 131 Oh St 356, 6 OO 64, to support his contention that Ordinance No. 2237 is not subject to referendum, but a reading of this case discloses facts so different from the case at bar that we cannot accept it as controlling in this case. True, it was held in that case that Ordinance No. 3123-C, (similar to Ordinance No. 2226 in this case) was the initial ordinance and was subject to referendum, and that later ordinances incidental to and in furtherance of such project were not subject to referendum, but the court in so holding, had for consideration an entirely different set of facts than we have in this case. In the Sandusky case, a resolution was passed on the same date that Ordinance No. 3123-C was adopted, which resolution set forth a definite amount of bonds to be issued, the approximate date and maturity, the maximum rate of interest; provided for submission of question to the electors, etc. Furthermore, an election was held and the bond issue approved by the electors. Further ordinances, one (468-C) declaring the desire to proceed with the issuing of bonds in the principal amount of $1,400,000 for the purposes named in the prior resolution, and No. 468-C, requiring the clerk to give notice of the election, were adopted, and no referendum had upon either. It was after the enactment of all this legislation, and after the election at which the bond issue was approved by the electors, that Ordinance No. 3382-3, providing for the actual issue of bonds, and determining that notes should be issued in anticipation of the issuing of the bonds, upon which a referendum was sought. Certainly this latter ordinance, in view of all that had taken place before, was incidental to and in furtherance of the project, but in the case at bar the "initial ordinance" was not accompanied by a resolution such as here described, nor any resolution. It contained a mere declaration of necessity to construct or purchase a municipal electric light power plant, including transmission and distribution lines and land therefor. The electors had no means of knowing the amount of bonds to be issued, whether mortgage revenue bonds, or general obligation bonds, or whether any bonds would be issued. Whether a plant was to be purchased at an outrageous price or whether the price would be only nominal. We think the electorate of Middletown was certainly entitled to

sufficient information on which to intelligently determine the desirability of the referendum. This, the first ordinance, (No. 2226), utterly fails to supply.

It is contended that if the bonds are general obligation bonds, then the people have a right to determine whether they should be issued, but if the bonds are to be mortgage revenue bonds, no vote thereon is necessary. This, of course, is true, and if general obligation bonds exceeding the net authorized indebtedness are to be issued, the people express their approval or disapproval at the polls. but if mortgage revenue bonds are to be issued they do not have this opportunity, except through referendum. Moreover, the referendum is intended to be in addition to the right to vote on the proposition otherwise provided, and the very section of the constitution providing for the exercise of the power herein sought to be exercised, and upon which the city commission relies, contains the provision for a referendum, which is in effect a limitation or restriction upon the power so conferred. Previously in this opinion, we have held fast to the rule that the organic law is supreme and so intended to be by the people who made and adopted it; that the constitution in its supremacy was intended to be alive, effective and enforcible, and consistency. if there were nothing more, requires that this very democratic principle of referendum be not now shunted to the side or treated so lightly. It might be noted here that the legislation immediately following the enactment of the "initial" ordinance tended toward the idea of issuing general obligation bonds, in which event, the people would have had an opportunity to vote on the proposition, but this legislation was later repealed, and whether any person was misled by the enactment of such legislation, it is unnecessary to determine since the right to a referendum existed regardless thereof, but it does serve, however, to show the value and the importance of the referendum provision and to exemplify the wisdom of the enactment thereof.

Since Ordinance No. 2237 is the first resolution containing information sufficient to determine the advisability of a referendum, we conclude that such ordinance was subject to referendum and could not take effect until the expiration of thirty days from its enactment. We cannot agree with counsel, however, that said ordinance, by reason of the emergency clause, was rendered null and void. On the contrary, we think the ordinance was subject to referendum, regardless of the emergency clause. The emergency clause is made a separate section of the ordinance itself, and is no part of its operative provisions. It contains none of the elements of the ordinance; the ordinance is complete without the clause which was merely intended to make it immediately effective and operative without waiting the lapse of thirty days. Section 14 of the ordinance provides:

Section 14. Each section of this ordinance and each subdivision of any section thereof is hereby declared to be independent, and the finding or holding of any section or subdivision or any section thereof to be invalid or void shall not be deemed or held to affect the validity of any other section or subdivision of this ordinance.

The commission could not have used plainer language than contained in this section to signify its intention to enact the emergency clause separate and apart from the remainder of the ordinance, and our conclusion is that the ordinance, simply because it contained the emergency clause, is not thereby invalidated, but, at the expiration of the thiry day period, the ordinance would become effective and in full force, providing a referendum was not sought. This must be the extent of our holding in relation to this proposition, since in this case the evidence fails to disclose any attempt to obtain a referendum. A stipulation was proffered concerning the filing of referendum petitions, but the matter was not

agreed upon, and therefore was not stipulated into the record. The record is completely silent on this subject.

We shall not discuss further the additional issues of fact raised in intervenor Miller's petition and amended petition, except to say that the evidence fails to disclose any wrongdoing on the part of the city commission, the city manager, or any one connected with the transaction, or any wilful act by either amounting to fraud or collusion. The gentlemen composing the city commission, and the city manager, are not presumed to be masters in the art of financing, but it does seem that they have attempted to serve the best interests of the city which they represent. That their efforts come to naught is unfortunate, especially in view of the large government grant from which the city was expected to benefit. In view of the highly controversial matters involved and the "now or never" attitude of the federal government in regard to grants no blame can be attached to the city officials or their advisors but the court can not look to the anticipated benefits and disregard the law of the land. Seemingly, it might bring about injustice in isolated cases but to avoid anticipated or threatened evils the law must be given its uniform operation. If a change in the law is desirable certainly that change should not and can not be effected by judicial decree.

Only one other question of importance remains and that is whether the Cincinnati Gas & Electric Company, as a taxpayer should be allowed to intervene. A taxpayer, it is said, is an agency created by the legislature to represent the interest of the public. It is upon this theory, if at all, that a taxpayer is allowed to intervene when the solicitor has instituted the action.

On behalf of defendants, the case of **City of Lakewood et al v Rees, 51 Oh Ap 490, 5 OO 199,** is quoted at great length, and in the opinion we find the following:

"The spectacle of the same law office representing both sides of a law suit at first flush seems incongruous and incompatible with any reasonable hope of correct results. Occasionally a lawyer or a member of the judiciary, unmindful of or ignoring statutory regulations, and arrogating to himself an unbecoming righteousness, will vociferously condemn such procedure. * * * There are questions of law mostly and lawyers on each side to brief the law for the court. Assume that one or both will fall short of full performance, the integrity of the court should not be challenged."

If we were compelled to adhere to the reasoning as contained in the above language, we would do so very reluctantly, although we make no claim to being overly righteous. The court is entitled to have both sides of any issue presented fairly and fully and without requesting additional briefs, and in demanding this, the integrity of the court is not challenged. It occurs to me that it could be said with just as much force and reason that a lawyer representing both sides of a contested case, in order to assure correct results, must not only be endowed with an abundance of righteousness, but must also possess some celestial attributes not common to ordinary mankind.

In this case, the solicitor did file the pleadings as requested, but he admits that he assisted opposing counsel during the trial, consulting with him and defendant's witnesses, subpoenaing witnesses for the defendants and testifying on defendant's behalf.

**Sec. 4314, GC** being remedial should be construed liberally, and we prefer to follow the reasoning of the concurring opinion in the above case, which holds that the compliance contemplated by the statute is a substantial compliance so that the court will have presented to it all the issues of law and fact, in order that a full and complete adjudication may be had.

Intervenor's petition may be filed as of the date submitted, and defendants

may file an answer thereto, if they so desire.

Entertaining the views herein expressed, the conclusion of the court is that the injunctive relief prayed for must be granted.