OHIO WATER SERVICE COMPANY, PLAINTIFF, *v.* WASHINGTON (CITY) ET, DEFENDANTS.

Common Pleas Court, Fayette County.

No. 23014.   Decided July 7, 1961.

*Mr. James E. Mitchell* of *Messrs. Mitchell, Mitchell & Reed,*
*Mr. Frank C. Dunbar, Jr.* of *Messrs. Dunbar, Kienzle & Mur-*
*phey* and *Mr. Ray R. Maddox* of *Messrs. Maddox & Hire,* for
plaintiff.

*Mr. J. W. Adkins, Jr.* and *Mr. William M. Junk* of *Messrs.*
*Junk & Junk,* for defendants.

CASE, J.  Plaintiff filed its first amended petition herein on
May 15, 1961, and therein alleged as follows:

"Ohio Water Service Company, the plaintiff herein, is a
public utility corporation, organized and existing under the
laws of the State of Ohio, and pursuant to leave of court here-
tofore granted, files this, its first amended petition, and for its
cause of action says that:

"(1) The plaintiff is now, and has been for many years,
the owner and operator of a complete waterworks system which
is providing a public water supply and service including fire
protection to the defendant City of Washington, the residents
thereof and residents of territory adjacent thereto.  In the
normal and regular course of plaintiff's operations in furnish-
ing public water service, the plaintiff is steadily and constantly
adding to and expanding its facilities in order to provide for
new demands for service within the City of Washington and
said territory.

"(2) The defendant, the City of Washington, is a municipal
corporation, located in Fayette County, Ohio.  The defendant,

R. S. Sanderson, Jr., is the duly elected, qualified and acting president of the council of the City of Washington. The defendants, C. L. Musser, H. E. Wilson, B. F. Norris, Walter Morrow, James H. Shoemaker, and Joe F. Loudner, are the duly elected, qualified, and acting members of the council of the City of Washington. The defendant, J. D. Foell, is the city manager of the City of Washington.

"(3) On or about the 22nd day of March, 1961, the council of the City of Washington, composed of the aforementioned defendants, passed a resolution declaring it to be the intent of the City of Washington to appropriate all of the right, title, and interest of the Ohio Water Service Company in all of the physical properties and assets presently owned or used by said company and comprising its water supply and distribution system, whether within or without the corporate limits of the City, in the supply of water to the City of Washington and its inhabitants. Said resolution proceeded to describe in some detail certain real and personal properties and intangible rights belonging to the Ohio Water Service Company which comprise a major and integral part of the plaintiff's entire water system serving said city and adjacent territory.

"(4) The aforesaid resolution further provided that the defendant, J. D. Foell, caused written notice of the passage of said resolution to be given to the plaintiff and to any other persons in possession of or having an interest of record in any of the premises or property specifically described in said resolution, and that said notice be served according to law by a person designated for that purpose by the defendant, J. D. Foell, which person was by the resolution required to make return of service of said notice in the manner provided by law.

"(5) Said resolution, by its own terms, was declared to be an emergency measure necessary for the peace, health, and safety of the City of Washington, for the stated reason that an immediate acquisition of a municipal water supply is necessary to secure an adequate water supply system for the City of Washington and its inhabitants. Said resolution further provided that it should take effect and be in force immediately upon its passage. The only language of the resolution bearing upon the alleged emergency character of the measure, any reason therefor, and the effective date of the resolution is in Sec-

tion 3 of the resolution, which, in its entirety, is as follows:

" 'SECTION 3. This resolution is declared to be an emergency measure necessary for the peace, health and safety of the City and for the further reason that immediate acquisition of a municipal water supply system is necessary to secure an adequate water supply system for the city and its inhabitants; wherefore, it shall take effect and be in force immediately upon its passage.' "

"(6) There did not in fact exist and there does not now exist any emergency making it necessary for the peace, health, or safety of the City of Washington that the aforesaid resolution take effect and be in force immediately upon its passage. An immediate acquisition of a municipal water supply was not and is not necessary to secure an adequate water supply system for the City of Washington or its inhabitants. At the time of the adoption of the aforesaid resolution there existed and at all times since has existed an adequate water supply system for the City of Washington and its inhabitants.

"(7) Pursuant to the directions contained in said resolution, notice of its passage was served on the plaintiff on the first day of April, 1961, and notice thereof has been served on numerous other persons.

"(8) Said resolution was adopted pursuant to Section 719.04, Revised Code, and the defendants are following, and unless enjoined by this court will continue to follow, the procedures prescribed in Section 719.04, Revised Code, and subsequent sections of Chapter 719, Revised Code, with respect to appropriating the plaintiff's properties described in the aforesaid resolution and with respect to the assessment of the compensation to be paid therefor.

"(9) Since the passage of said resolution, which sets forth the property to be appropriated, the plaintiff has made additions and extensions to its system in the City of Washington in the normal and regular course of its operations and it will be necessary for it to continue to do so in order that it may discharge its legal duties and obligations as a public utility serving the City of Washington, and the residents thereof, and other persons non-resident thereof who are served by the same plant and system. Said additions and extensions, which are not included in the property described in said resolution, have been and will

be made at a cost of thousands of dollars, and will be rendered substantially valueless if defendants are not enjoined.

"(10) The aforesaid resolution is improper, irregular, and illegal in that the defendants may not proceed under Chapter 719, Revised Code, to appropriate the plaintiff's real, personal, and intangible properties and assets described in the aforesaid resolution, because no jurisdiction has been conferred upon any court to entertain proceedings for the assessment of compensation to be paid by the would-be condemnor for said properties and assets. Said resolution, together with the acts of the defendants taken and to be taken pursuant thereto, under the alleged authority of Chapter 719, Revised Code, constitutes and will constitute an unwarranted and illegal interference with the plaintiff's ownership and operation of its properties as a public utility in the City of Washington in that they prejudice the plaintiff's ability to obtain needed financing for its operations and for the construction of additions and improvements; they create problems in the collection of plaintiff's accounts; they interfere with the plaintiff's internal operations; and they make it impossible for plaintiff to make rational determinations as to whether and to what extent plaintiff should expend funds for additions to enable it to furnish adequate service to the public; all of which will result in irreparable harm and damage to the plaintiff and to those dependent upon the plaintiff for water service and fire protection.

"WHEREFORE, plaintiff prays that the aforesaid resolution be declared to be a nullity, and that the defendants and each of them be permanently enjoined from taking any further action pursuant to Chapter 719, Revised Code, to appropriate the real, personal, and intangible properties and assets owned by the plaintiff on March 22, 1961, as described in the aforesaid resolution, and for such other and further relief as the court may deem just and proper in the premises."

On June 17, 1961, defendants filed the following demurrer to said first amended petition:

"Now come William Junk and J. W. Adkins, Jr., attorneys for the defendants herein, and demur to the First Amended Petition of plaintiff for the following ground and reason, towit:

"1. That the said First Amended Petition does not state facts which show a cause of action."

Upon due consideration of each and all of the allegations contained and set forth in plaintiff's first amended petition, it appears that plaintiff is seeking a declaratory judgment and injunctive relief.

In other words, plaintiff alleges and contends that the defendant-city's resolution of intent, "to appropriate all of the right, title, and interest of the Ohio Water Service Company in all of the physical properties and assets presently owned or used by said company and comprising its water supply and distribution system, whether within or without the corporate limits of the City in the supply of water to the City of Washington and its inhabitants," is "improper, irregular, and illegal in that the defendants may not proceed under Chapter 719, Revised Code, to appropriate the plaintiff's real, personal, and intangible properties and assets described in the aforesaid resolution, because no jurisdiction has been conferred upon any court to entertain proceedings for the assessment of compensation to be paid by the would-be condemnor for said property and assets"; and that, by reason of the matters and things stated and contained in said resolution of intent so passed by said defendants on March 22, 1961, the plaintiff is entitled to a declaratory judgment holding said resolution to be a nullity.

And, in the light of the allegations so made and set forth in plaintiff's first amended petition, the court must first consider the provisions of Section 2721.03, Revised Code, which read:

"Any person interested under a deed, will, written contract, or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under such instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."

The court also notes, in Page's Ohio Revised Code, the following "Comment," immediately following the above quoted provisions:

"This section makes it possible for any person interested in any of the instruments specified or affected by any of the legislation mentioned, to have any question of construction or

validity, and also their rights, determined. This covers a large field of possibilities, among which are disputes between lessor and lessee, mortgagor and mortgagee, questions concerning insurance policies, deeds of trust, disputes between a city and a street railway company, or any public utility, and a vast number of other disputes too numerous to mention.''

The court must also consider the provisions of Section 2721.07, Revised Code, which read:

''Courts of record may refuse to render or enter a declaratory judgment or decree when such judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding.''

Upon due consideration of all the allegations contained in plaintiff's first amended petition, insofar as the same may be connected with and related to an action for declaratory judgment, and particularly noting and considering the allegations contained and set forth in numbered paragraphs ''(5)'' and ''(6)'' thereof which read:

''(5) Said resolution, by its own terms, was declared to be an emergency measure necessary for the peace, health, and safety of the City of Washington, for the stated reason that an immediate acquisition of a municipal water supply is necessary to secure an adequate water supply system for the City of Washington and its inhabitants. Said resolution further provided that it should take effect and be in force immediately upon its passage. The only language of the resolution bearing upon the alleged emergency character of the measure, any reason therefor, and the effective date of the resolution is in Section 3 of the resolution, which, in its entirety, is as follows:

'' 'SECTION 3. This resolution is declared to be an emergency measure necessary for the peace, health and safety of the City and for the further reason that immediate acquisition of a municipal water supply system is necessary to secure an adequate water supply system for the city and its inhabitants; wherefore, it shall take effect and be in force immediately upon its passage.'

''(6) There did not in fact exist and there does not now exist any emergency making it necessary for the peace, health, or safety of the City of Washington that the aforesaid resolution take effect and be in force immediately upon its passage.

An immediate acquisition of a municipal water supply was not and is not necessary to secure an adequate water supply system for the City of Washington or its inhabitants. At the time of the adoption of the aforesaid resolution there. existed and at all times since has existed an adequate water supply system for the City of Washington and its inhabitants."

this court must consider and apply the rule of law stated and referred to in *Middletown* v. *City Comm.*, 29 Ohio Law Abs., 625, headnote 7 of which reads:

"7. The legislative branch has exclusive authority to determine the existence of an emergency, whether an emergency really existed at the time when an ordinance was enacted is not subject for judicial inquiry."

and, beginning on page 634 thereof, Judge McDowell stated in part as follows:

"* * * since the Supreme Court of Ohio has spoken definitely and unequivocally upon that subject, and it is now well established in this state that the legislative branch has exclusive authority to determine the existence of an emergency, and that the judicial branch has no duty or authority to interfere with the judgment so exercised. In other words, whether an emergency really did exist at the time the ordinance in question was enacted is not a subject for judicial inquiry. *State, ex rel.,* v. *Kennedy,* 132 Ohio St., 510, 8 Ohio Opinions, 494.".

Also, in *Holcomb* v. *State, ex rel.,* 126 Ohio St., 496, paragraph 3 of the syllabus thereof, the following rule of law was declared by the Supreme Court of Ohio:

"3. The duty and responsibility of determining the emergency and the necessity that a measure go into immediate effect are confided to the legislative branch of government. If the prescribed procedure for enactment thereof is followed, such measure goes into effect immediately upon the passage."

and in *State, ex rel. Fostoria,* v. *King,* 154 Ohio St., 213, paragraph 4 of the syllabus thereof, the Supreme Court of Ohio stated the rule of law to be:

"4. The duty and responsibility of determining the emergency and the necessity that a measure go into immediate effect and of giving reasons for such necessity are placed by Section 4227-3, General Code, in the council or other body corresponding to the council of a municipality. Such a determination by a

municipal council and the soundness of the reasons stated by such council for such necessity are not subject to review by the courts.''

It is noted that former Section 4227-3, General Code, is now Section 731.30, Revised Code, and contains substantially the same language concerning such ''emergency ordinances or measures.''

It is also noted that plaintiff's first amended petition contains no allegations whatever to the effect that defendants failed, neglected or refused to follow the prescribed procedure for the enactment of the aforesaid resolution of intent as an emergency measure.

Therefore, upon the application of the aforesaid rules of law to all of those allegations contained in plaintiff's first amended petition, insofar as the same are connected with and related to an action for declaratory judgment and based, as in the case at bar, upon plaintiff's allegations and contentions with respect to the question of whether or not an emergency really did exist on March 22, 1961, at the time said resolution in question was enacted and passed, this court is compelled to conclude that such question of emergency is not a subject for judicial inquiry upon plaintiff's first amended petition for a declaratory judgment, and is properly subject to demurrer.

And, in the light of the authorities hereinabove cited and discussed, this court must further conclude that defendants' demurrer, insofar as it is directed to all of those allegations of said petition seeking a declaratory judgment based upon the question of whether or not an emergency really existed, is well made and should be sustained.

And, with respect to all of the allegations contained in plaintiff's first amended petition purporting to set forth and entitle the plaintiff to a declaratory judgment as to whether or not the aforesaid resolution of intent ''is improper, irregular, and illegal,'' and as to whether or not said defendants may or may not proceed under Chapter 719, Revised Code, to appropriate the plaintiff's real, personal, and intangible properties and assets described in said resolution of intent, and as to whether or not jurisdiction has been conferred upon any court to entertain proceedings for the assessment of compensation to be paid by such condemnor for said properties and assets,

this court has carefully considered the first sentence in numbered paragraph ''(10)'' of plaintiff's first amended petition which reads:

''(10) The aforesaid resolution is improper, irregular, and illegal in that the defendants may not proceed under Chapter 719, Revised Code, to appropriate the plaintiff's real, personal, and intangible properties and assets described in the aforesaid resolution, because no jurisdiction has been conferred upon any court to entertain proceedings for the assessment of compensation to be paid by the would-be condemnor for said properties and assets.''

So, it clearly appears that plaintiff alleges and contends defendants' resolution of intent is ''improper, irregular, and illegal'' because it was enacted and passed in accordance with the provisions of Chapter 719, Revised Code; that plaintiff further alleges and contends the provisions of Chapter 719, Revised Code, do not confer jurisdiction upon any court whereby a municipality can appropriate the real, personal and intangible properties of a public utility water company; and that plaintiff thereby alleges and contends the provisions of Chapter 719, Revised Code, do not confer jurisdiction upon any court to entertain a proceeding for the assessment of compensation to be paid by a municipality in the appropriation of real, personal and intangible properties of a public utility water company.

It is equally clear that plaintiff is not alleging and does not contend defendants' resolution of intent was enacted and passed contrary to the statute or constitutional law of this state.

On the other hand, it clearly appears that plaintiff's complaint is based upon defendants' compliance with the statutory provisions of Chapter 719, Revised Code, in the passage of said resolution, and upon plaintiff's anticipation that defendants intend to take further action to enact an appropriation ordinance at a subsequent date in conformity and compliance with the provisions of Chapter 719, Revised Code.

The court has carefully studied and considered plaintiff's brief which was filed in opposition to defendants' demurrer, and deems it worthy of quotation herein in its entirety. It reads as follows:

''Defendants begin their memorandum in support of their demurrer by saying that it is plaintiff's apparent position 'that

Chapter 719, Revised Code, does not confer power upon a municipality to appropriate real, personal and intangible properties and assets.' That is precisely plaintiff's position. But, further, it is vain and useless to talk about whether the 'power' or 'right' to appropriate is conferred by the statutes. The right to appropriate is conferred by the Ohio constitution itself, in Article XVIII, Sections 4 and 5.

"Prior to the adoption of sections 4 and 5 of Article XVIII, in 1912, the statute which is now Section 710.01, Revised Code, did confer the right and power upon a municipality to appropriate real property of a water company when the purpose of that appropriation was to provide a water supply for the municipality and its inhabitants 'by the construction of wells, pumps, cisterns, aqueducts, water pipes, dams, reservoirs, reservoir sites, and waterworks, and for the protection thereof . . .' We discussed this somewhat fully at pages 14-21 of our brief contra the demurrer to the original petition, which we respectfully invite the court to examine again. No one contended prior to 1912 that there was any authority for a municipality to acquire an operating utility—if there were, the incorporation in Sections 4 and 5 of Article XVIII of the provisions authorizing condemnation was unnecessary. A complete utility, being impressed with a public interest and already devoted to the service of the public, was not subject to condemnation by a political subdivision, until the constitution so provided.

"In saying that it is plaintiff's position that Chapter 719, Revised Code, does not confer power upon a municipality to appropriate an entire utility, including both real and personal and tangible and intangible properties and assets, defendants missed the whole point. What plaintiff contends, and earnestly invites the court to consider, is that Section 19 of Article I of the Ohio Constitution makes it mandatory that before private property can be taken for public use the compensation to be paid for it must be assessed by a jury, impanelled and instructed by a court vested with jurisdiction to entertain the assessment-of-compensation proceedings. What plaintiff says about Chapter 719, Revised Code, is not that it confers no power upon a municipality to appropriate in the instant circumstances, but that neither it nor any other provision in the statutes of Ohio

confers jurisdiction upon any court, nor establishes any procedure in any court, for the assessment of compensation with respect to such property.

"Defendants answer our foregoing contention by pointing out that the Court of Appeals in the Circleville case arrived at a different conclusion. We submit that this is not a sufficient answer, and that this court should not be controlled by the decision in the Circleville case. On that, we refer the court to pages 23-28 of our brief on the demurrer to the original petition. Therein, we explained why we believed that case was incorrectly decided. We will here amplify that discussion only in one particular.

"Defendants quote (page 3 of their memorandum) a paragraph from Judge Metcalf's opinion in the Circleville case in which it is said that

" 'It would seem an idle gesture to authorize a municipal corporation to appropriate only real estate of a utility corporation, which corporation had already installed the necessary equipment to carry the water from its source to the city or consumer inhabitant and then compel the city on the one hand to reconstruct, to purchase anew or to parallel the lines or duplicate the equipment of the utility corporation or on the other hand to compel the utility corporation to give up by appropriation proceedings its real estate only and have remaining all and sundry the personal property and equipment necessary to carry on the many phases of obtaining, processing and delivering water. The injustice of such a construction of the statute under consideration should be patent to anyone.

" 'The Legislature must have had in mind a situation as presented in the instant appeal when it deliberately used the words "any property" in subsection 13 in lieu of real estate or land. To give that subsection any other interpretation or construction would defeat the very purpose of its enactment.' "

"The legislature could not have had in mind a situation like that in Circleville and here when it used the words to which Judge Metcalf referred. Such a situation was not possible when the legislature enacted the statute which is now division (M) of Section 719.01, Revised Code, which occurred before the adoption of Article XVIII of the Constitution. What was possible under the constitution and statutes at that time was

that a municipality could provide "a water supply for itself and its inhabitants *by the construction of*" appropriate facilities, and it might need to acquire real estate, including easements (which are, of course, interests in real property) in order to construct such facilities. It would be quite possible, for example, for a municipality to appropriate an easement over land owned by a water company, without destroying or even impairing the company's ability to continue to serve the public as a public utility.

"We believe that Judge Metcalf in that case, in attempting to read a rational meaning into what is now division (M) of Section 719.01, Revised Code, and to divine the purpose of the legislature in enacting it, failed to put himself into the position of the legislature at the time of the enactment, that is, failed to orient his thinking with the constitutional and legal "climate" at the time of the enactment.

"We submit that what is *not* contained in Chapter 719, Revised Code, in addition to what is contained therein, makes it further evident that the provisions of that chapter were not intended to have any application to an appropriation of the kind which is attempted here, and that they do not confer jurisdiction upon any court to entertain proceedings for the assessment of compensation for such property. In particular, that chapter of the code contains no authority for the appropriation of personal or intangible property; it makes no provision for facilities acquired or constructed by a utility in the normal course of its operations after the time of commencement of appropriation proceedings, which become mandatory in order that it may perform its duties and obligations as a public utility. Counsel for the defendants in their brief recognize this and say that in the Circleville condemnation this deficiency was cured by a stipulation whereunder the "Company was compensated additionally for any extensions or additions made thereafter." But what if the parties cannot or do not agree upon such a stipulation? Is it due process of law that an order of property may be compelled, figuratively at gun point, to make an agreement that the property may be taken, with the sole alternative to so agreeing being that it will be taken without compensation or its value destroyed?

"Both what was said by the Court of Appeals in the *Circle-*

*ville case,* and the defendants' contention here ignore the rule of law that a constitutional amendment cannot be implemented by pre-existing legislation, unless it is so provided in the amendment itself. Further, the Circleville court and the defendants' contention ignore the fact that immediately after the adoption of the 1912 amendments, the general assembly recognized the necessity for implementing the condemnation provision of those amendments by providing by statute a procedure for the condemnation of street railway utilities. Either that general assembly or Judge Metcalf was in error. We respectfully submit that it was the judge, and that this court, which is not compelled to follow the decision in the *Circleville case,* should not follow it.

"For the convenience of the court in comparing the amended petition with the original petition, we are setting forth below, by paragraph numbers as those numbers appear in the amended petition, the allegations which have been added, or in some cases rephrased, in the amended petition. They are as follows:

" '(1) . . . and residents of territory adjacent thereto. In the normal and regular course of plaintiff's operations in furnishing public water service, the plaintiff is steadily and constantly adding to and expanding its facilities in order to provide for new demands for service within the City of Washington and said territory.' "

" '(3) . . . all of the physical properties and assets presently owned or used by said company and comprising its water supply and distribution system, whether within or without the corporate limits of the City, in the supply of water to the City of Washington and its inhabitants. Said resolution proceeded to describe in some detail certain real and personal properties and intangible rights belonging to the Ohio Water Service Company which comprise a major and integral part of the plaintiff's entire water system serving said city and adjacent territory.' "

" '(5) . . . The only language of the resolution bearing upon the alleged emergency character of the measure, any reason therefor, and the effective date of the resolution is in Section 3 of the resolution, which, in its entirety, is as follows:

" 'SECTION 3. This resolution is declared to be an emer-

gency measure necessary for the peace, health and safety of the City and for the further reason that immediate acquisition of a municipal water supply system is necessary to secure an adequate water supply system for the city and its inhabitants; wherefore, it shall take effect and be in force immediately upon its passage.' ''

" '(7) ... and notice thereof has been served on numerous other persons.

" '(8) Said resolution was adopted pursuant to Section 719.04, Revised Code, and the defendants are following, and unless enjoined by this court will continue to follow, the procedures prescribed in Section 719.04, Revised Code and subsequent sections of Chapter 719, Revised Code, with respect to appropriating the plaintiff's properties described in the aforesaid resolution and with respect to the assessment of the compensation to be paid therefor.

" '(9) Since the passage of said resolution, which sets forth the property to be appropriated, the plaintiff has made additions and extensions to its system in the City of Washington in the normal and regular course of its operations and it will be necessary for it to continue to do so in order that it may discharge its legal duties and obligations as a public utility serving the City of Washington, and the residents thereof, and other persons nonresident thereof who are served by the same plant and system. Said additions and extensions, which are not included in the property described in said resolution, have been and will be made at a cost of thousands of dollars, and will be rendered substantially valueless if defendants are not enjoined.

" '(10) The aforesaid resolution is improper, irregular, and illegal in that the defendants may not proceed under Chapter 719, Revised Code, to appropriate the plaintiff's real, personal, and intangible properties and assets described in the aforesaid resolution, because no jurisdiction has been conferred upon any court to entertain proceedings for the assessment of compensation to be paid by the would-be condemnor for said properties and assets. Said resolution, together with the acts of the defendants taken and to be taken pursuant thereto, under the alleged authority of Chapter 719, Revised Code, constitutes and will constitute an unwarranted and illegal interference with

the plaintiff's ownership and operation of its properties as a public utility in the City of Washington in that they prejudice the plaintiff's ability to obtain needed financing for its operations and for the construction of additions and improvements, they create problems in the collection of plaintiff's accounts; they interfere with the plaintiff's internal operations; and they make it impossible for plaintiff to make rational determinations as to whether and to what extent plaintiff should expend funds for additions to enable it to furnish adequate service to the public; all of which will result in irreparable harm and damage to the plaintiff and to those dependent upon the plaintiff for water service and fire protection.' "

"We believe, of course, that all of the foregoing allegations can be fully proven by evidence upon trial, and in any event they must be taken as true for the purposes of the demurrer. It is, therefore, a fact that the plaintiff is steadily and constantly adding to and expanding its facilities in order to provide for new demands for service within the City of Washington and territory adjacent thereto; that the plaintiff has made additions and extensions to its system in the City of Washington in the normal and regular course of its operations; that it will be necessary for it to continue to do so; that said additions and extensions are not included in the property which the City of Washington proposes to appropriate; that the resolution of intention to appropriate, together with the acts of the defendants taken and to be taken pursuant thereto, constitutes and will constitute an unwarranted and illegal interference with plaintiff's ownership and operation of its properties as a public utility in the City of Washington in that they prejudice the plaintiff's ability to obtain needed financing for its operations and for the construction of additions and improvements; that they create problems in the collection of plaintiff's accounts; that they interfere with the plaintiff's internal operations; and that they make it impossible for plaintiff to make rational determinations as to whether and to what extent plaintiff should expend funds for additions to enable it to furnish adequate service to the public. It is also a fact (it was not alleged in the original petition) that the resolution was adopted pursuant to Section 719.04, Revised Code, and that the defendants are following and unless enjoined by the court will continue to fol-

low the procedures prescribed in Section 719.04, Revised Code, and subsequent sections in Chapter 719, Revised Code, with respect to the appropriation of the properties of the plaintiff which are described in the resolution.

"We earnestly submit to the court that whether or not there was a fatal efficiency in the original petition, there is none in the amended petition, and that the demurrer should be overruled.

"Finally, we point out to the court that although the caption of the petition labels it as one for injunction, the prayer is not only for an injunction but also for a declaration that the resolution is a nullity, and for such other and further relief as the court may deem just and proper in the premises. If, contrary to our belief, the court should conclude that for some reason the petition does not include all the ingredients of a cause of action for equitable relief, it at least states a cause of action for relief by way of declaratory judgment.

"If the court and opposing counsel shall so prefer, the plaintiff will be quite content that this matter be submitted upon briefs, without oral argument."

Therefore, by its first amended petition, plaintiff is seeking a declaratory judgment that would hold and declare there is no law of Ohio which could or would confer jurisdiction upon any court of Ohio to empanel a jury for the assessment of compensation to be awarded a public utility water company even though a municipality had enacted an appropriation ordinance and its solicitor had thereupon made application to the court, all in conformity with the provisions of Chapter 719, Revised Code.

Now, before this court, or any court, would so hold and declare such to be the law of Ohio, it should and must consider the rules of law declared and pronounced by the Court of Appeals for Pickaway County in the case of *The Ohio Water Service Co.* v. *City of Circleville*, 82 Ohio App., 159, in the headnotes thereto which read:

"1. The second paragraph of Section 3677, General Code, wherein power is granted to a municipality to appropriate real estate within the corporate limits, does not place a limitation on the authority granted to a municipality, under paragraph 13 of such section, to appropriate 'any property' within or without the corporate limits for a water supply.

"2. A municipality is empowered to appropriate, under paragraph 13 of Section 3677, General Code, a complete waterworks of a private corporation, composed of real and personal property, as long as such property is a necessary part of the system of producing, processing and delivering water to the municipality or its inhabitants.

"3. Section 4, Article XVIII, Constitution, authorizes a municipality, in the absence of statutory enactment, to acquire, by condemnation, any public utility the product or service of which is to be supplied to the municipality or its inhabitants."

And it appears that plaintiff in the case at bar was the appellant in the aforesaid case, and that Mr. Frank C. Dunbar, Jr., of counsel for plaintiff in the case at bar, was one of the attorneys of counsel for the appellant in the *Circleville case.*

And if this court, or any court, was to declare the law of Ohio to be other than that so pronounced and declared by said court of appeals, then it would be reasonably necessary and proper for this court, or any such court, to distinguish between the instant case at bar and the matters and things considered and determined by said court of appeals or, on the other hand, to overrule the principles and rules of law so declared by said court of appeals in the *Circleville case.*

It is not disputed that, in substance and effect, the language and provisions of Section 3677, General Code, and related sections of the General Code, pertaining to the appropriation of a public utility by a municipality, as considered and declared by said court of appeals in 1947, are presently incorporated in the provisions of Chapter 719, Revised Code, concerning which the plaintiff is here seeking a declaratory judgment contra to the rules and principles of law so pronounced and declared by said court of appeals in the *Circleville case.*

It clearly appears in said appellate court decision that part of the relief sought therein, by said plaintiff-appellant utility, was a declaratory judgment adjudicating plaintiff's rights relative to said appropriation statutes and such equipment and property which plaintiff had added to and placed in use in said water system "subsequent to the appropriation proceedings" complained of therein.

The statutory provisions so considered and construed by said appellate court, together with its pronouncements and de-

clarations thereon, constitute a clear declaration that jurisdiction has been conferred upon the common pleas courts of Ohio to entertain proceedings for the assessment of compensation in the appropriation of water companies by municipalities under what is now Chapter 719, Revised Code.

It should be noted, however, that the action for declaratory judgment sought by plaintiff-appellant in the *Circleville case* was instituted by a separate action commenced *after* the jury had been empanelled and compensation assessed and awarded to the water utility; while, in the case at bar, plaintiff is seeking a declaratory judgment, upon the ground that the court is without jurisdiction, *before* an appropriation ordinance had been enacted and *before* any application had been made by the municipality to invoke the jurisdiction of this court under Chapter 719, Revised Code.

Although plaintiff's first amended petition contains no allegations whatsoever specifically mentioning Sections 4 and 5 of Article XVIII, Ohio Constitution, this court, by indulging every reasonable inference and giving to plaintiff's first amended petition a liberal construction most favorable to the plaintiff, should and does construe and consider plaintiff's allegation (contained in the first sentence of numbered paragraph "10" thereof) that—"no jurisdiction has been conferred upon any court"—to mean and allege, in substance and effect, that plaintiff is alleging and claiming there are no statutory or constitutional provisions of this state which confer jurisdiction upon any court in Ohio to empanel a jury to assess and award compensation for the real, personal and intangible properties of a public utility water company.

Such liberal construction and interpretation of plaintiff's first amended petition appears to be clearly justified and warranted in the light of the arguments and contentions presented by plaintiff's brief contra defendants' demurrer herein.

In other words, by its brief, plaintiff argues and contends, in substance and effect (A):—that Section 719.01 (M), Revised Code, and related Section of the Revised Code (formerly Section 3677 [13], and related Sections of the General Code), do not confer jurisdiction upon any Ohio court to empanel a jury to assess and award compensation for any properties of a public utility water company other than its real estate; and (B);—

that, since Sections 4 and 5 of Article XVIII, Ohio Constitution, were adopted in 1912 (approximately two years after the enactment of former Section 3677 [13], which is now Section 719.01 [M], Revised Code), and, although said Sections of Article XVIII expressly provide a municipality may acquire the use and full title to the property and franchise of any such utility, that, since said 1912 amendment to our constitution, no enabling statutes have been enacted providing for the procedure to be followed subsequent to an appropriation ordinance or expressly designating any court of Ohio which would be authorized to empanel a jury to assess compensation for the condemnation of a public utility pursuant to the provisions of Sections 4 and 5 of Article XVIII of our constitution.

By such interpretation of Chapter 719, Revised Code, and Article XVIII, the plaintiff would have this court ignore the rules of law stated and pronounced in the *Circleville case, supra*; and argues:

"We believe that Judge Metcalf in that case, in attempting to read a rational meaning into what is now division (M) of Section 719.01, Revised Code, and to divine the purpose of the legislature in enacting it, failed to put himself into the position of the legislature at the time of the enactment, that is, failed to orient his thinking with the constitutional and legal 'climate' at the time of the enactment."

In an effort to avoid some similar criticism, this court has studied and considered Volume II, Proceedings and Debates of the Constitutional Convention of Ohio (1912) with regard to the Municipal Home Rule amendments, and in order to ascertain, if possible, the intention of Sections 4 and 5 of Article XVIII upon consideration of the language used, the object to be accomplished by the provisions, and the surrounding circumstances of their adoption.

If such constitutional provisions merely indicate a line of policy or principles, without supplying the means by which such policy or principles are to be carried out, or if the language is directed to the legislature, or if it appears from the language used, or the circumstances of its adoption that subsequent legislation was contemplated to carry it into effect, it is then clearly not self-executing to supersede and/or supplant all or any part of any existing law.

But, if it be evident from the terms employed in any particular provisions of the organic law that it shall go into force and effect forthwith without awaiting subsequent ancillary legislation, it is the duty of the court to so declare it, and such duty will become evident only when the language employed is free from ambiguity, or when it appears, either from the language used, or from reasonable inference therefrom, or from other sources equally legitimate and accessible, where constitutional and statutory construction is involved, that the purpose of the section or sections in question will be defeated or frustrated unless immediate effect be accorded to the provisions thereof.

It must be conceded that the proceedings of a constitutional convention and debates are powerless to vary the terms of any section of the constitution, but such proceedings and debates are, nevertheless, of some probative value and aid in determining the purpose, the intent and the consequent meaning of any provisions concerning which a doubt or question has been raised as in the case at bar.

Obviously, in examining the proceedings of such a constitutional convention, the history and conditions of the times, the evils that existed which it was desired thereby to be remedied, and the issues and questions under consideration may be disclosed and revealed with such detail and clarity as would tend to show the purpose and intent of such constitutional amendments so adopted.

The proceedings and debates of the Ohio Constitutional Convention of 1912 clearly show that prior thereto the municipalities in Ohio derived their authority, power and rights almost entirely from the legislature. The "Home Rule Amendment" was debated vigorously, and, in debating the sections included in the case at bar, it was proposed that municipalities be given broad powers in acquiring a public utility.

Beginning on page 1455 of said proceedings and debates, it shows in part as follows:

"MR. KRAMER: Would it not be a whole lot better to limit the municipality in its ownership to such things as water supply and electric light supply and not allow it to go out into business— * * *

"MR. KNIGHT: If we want to stand still, yes—if we want to cut off the field of municipal activity; but a majority of us

are not of that opinion. We already have that power on one or two things and the distinct idea attempted to be stated at the very beginning—the distinct idea underlying the whole proposal, the idea, as we believe, of the present time and the future and the thing desired by the municipalities of the state of Ohio, is the opportunity when they please to go into the ownership and control and operation of public utilities, with the limitation upon the power to burden their people with taxes and debt as indicated by the latter provisions of the proposal."

And again, on page 1456, it reads in part as follows:

"MR. HARRIS, of Hamilton: * * * In listening to the discussion that we have had since seven o'clock this evening, it occurred to me that possibly proper recognition has not been had of the great difficulties under which your committee labored. There were two conflicting forces in the committee, those whom we shall call 'radicals'—without any desire, of course, to be offensive—who demanded that the fundamental basis of this proposal should be complete sovereignty in the municipality, independent of the state. There were others who thought they were progressive, but who would not accept that doctrine. They could not see how there could be a sovereignty within a sovereignty. So the first clash was between those who demanded all powers for the municipality, practically without reference to the state, and those who demanded that the state should be supreme.

"It is but fair to say that the most radical in the committee, with a fine sense of their obligations to the Convention, made very important concessions, and there was at no time anything but unanimity in the final consideration of every section. If you will read this proposal carefully you will see that the state is dominant. The great powers of taxation, the great police power, and the great powers of education and of health, all are held with a firm hand by the state. You may liken the power of the state to a bank note, through which the silken threads run strong and firm giving pliability but not permitting disintegration. That is the fundamental underlying principle of the proposal which you have to consider. The state is dominant in those principles in which, in the judgment of the committee, it should be dominant. Municipalities are given the greatest possible freedom, all of course protected and hedged in by these general fundamental principles. * * *"

and, on page 1458, Mr. Harris continued, in part, as follows:

"Section 4 confers power to acquire through purchase, lease or construction any and all public utilities, and the power is given to condemn for public use any existing private utility.

"Section 5 covers the method of procedure under Section 4. Of course it is inconceivable to imagine home rule without carrying with it the right of municipal ownership, and that without any regard whatsoever as to the individual opinions as to the advisability of municipal ownership, but home rule without the right of municipal ownership is the empty husk; the kernel has been removed.

"'* * *'"

and, on page 1862, Mr. Cunningham stated, in part, as follows:

"This proposal gives every little village and city in the state the right to buy in, or to condemn if it can not buy, any and all public utilities inside its limits and issue bonds to pay for the same. For example, they can buy or build street-car line, electric-light plants, gas plants and any other public utility that can be thought of, and extend them into the country beyond the corporate limits and operate them. We are to have 'no pent-up Uticas' in this great state of Ohio, and if there shall be in ten years a single village or city in the state that will not be absolutely bankrupt it will be because it will not be able to sell the bonds.

"If the committee who framed up this measure had set themselves deliberately to work to propose the worst and most vicious form of municipal government in the world they couldn't have succeeded better; and hence I insist that if this measure is to be submitted in its present form that the title at least should be changed so as not to deceive the people, but at least give them a gentle hint as to its true character.

"When all the money in the state is invested in the bonds issued to buy all these public utilities we will then have single tax without mistake. The bonds will be exempt and the utilities themselves will no longer pay any taxes. The millions now paid by them into the public treasury will be no longer available; consequently there will be but little left except real estate to pay taxes on. We are launching our municipal bark on an unknown sea without the rudder of common sense to guide it, and for one I protest."

and, beginning on page 1862, Mr. Lampson, stated in part, as follows:

"I think if municipalities are to go into the business generally of incorporating public utilities, it is only right that they should be fair to their own citizens who have heretofore been granted franchises and under those grants have built up public utilities through which they have been serving the people.

"The home rule proposal gives municipalities complete authority to engage in any business 'the service or product of which is supplied to the municipality or its inhabitants.' They may do this either by operating a new plant or by the acquirement of any existing property and franchises of any private citizen or company, either by condemnation or otherwise. This grant of power is fundamental and can never be abrogated, restricted or regulated by legislative act. * * *

"When ever private property is required for public purposes the government may condemn such private property and take it for its own use, but the government must pay to the owner just compensation for the property taken, together with such damages as are sustained through such condemnation. In all cases the justice of the compensation is determined by the value of the property before it has been damaged or depreciated. For example, a municipality condemning private property for a garbage plant would be required to pay the value of the property before the plant was built. It would not be permitted to depreciate the value of the property by locating the nuisance upon it and then buy it at its depreciated value.

"The people of Ohio are not ready understandingly to depart from this established rule, which merely recognizes the right of the individual to be protected in the enjoyment of his private property. No member of the Convention would tolerate a law which would permit a railroad to run its tracks through his property and assess the damage on the value of the property after the damage has been done; nor would they tolerate a law which would permit officials of the government to depreciate the value of their homes or their businesses in order to buy them at the depreciated value; yet that is exactly what is done if the officials temporarily in charge of the government are permitted to engage in unrestricted competition with a private business which they may at any time condemn and take over.

"Given the right to condemn at any time any private business, at a valuation fixed by a body of its own citizens, and with the further right to authorize private competition whenever competition appears to be desirable, it is impossible to conceive a situation wherein a municipality should be permitted to engage in competition."
and beginning on page 1865, Mr. Harris, stated, in part, as follows:

"Your question is misleading. The object of this home-rule proposal is not to do that which you say. By your question you reflect on the honesty and integrity of your fellow citizens. What would be the natural proceeding if Columbus, Coshocton, Youngstown, Delaware or Cincinnati wanted to acquire property of a private utility? It would be to condemn that property and pay the owners for it at a price fixed by twelve of their fellow citizens. It does not contemplate, and only a diseased mind can so believe, that the people of the villages or of the cities of the state will deliberatley be so mean and so wicked and so immoral' as to build a plant in competition, if there be one already of such a character and of such modern construction as will satisfy the needs of the community. You start out with the assumption that all of the people living in the villages and in the state of Ohio are immoral."

Although the above quote remarks, exchanged by and between some of the delegates at the 1912 Convention, do not reflect all of the bitterness of the battle for municipal home rule which took place upon the floor of the Convention, they do provide a considerable cross-section of the history of the times, and the existing problems for which the Convention was seeking remedies.

It is significant that much of the debate on "Home Rule" was directed to the acquisition of public utilities by purchase, construction and condemnation; and the latter also received sharp criticism with respect to whether or not municipalities would construct competitive utility services and then proceed to condemn an existing utility service through assessments of compensation to be made by jurys composed of local citizens.

It did not appear that any of the debate, so directed to such condemnation proceedings, with compensation to be fixed by jurys of local citizens, involved or contemplated any addi-

tional legislative enactment to confer jurisdiction upon any court or courts other than those courts which had been previously designated under Section 3681, General Code (now Section 719.06, Revised Code).

And, oddly enough, it did appear that the proponents and the opponents of the Home Rule Amendment, as adopted, were substantially in agreement that its provisions were in certain respects of such a nature as to amount to confiscation in the light of possible competitive conditions and circumstances which might exist when a municipality proceeded to invoke the appropriation powers granted thereunder; nevertheless, the majority rejected any proposals by the opponents to partially off set and counteract such possible confiscatory result upon the ground and for the reason that such proposals would in force and effect defeat and stultify the powers proposed to be granted in that part of the Home Rule Amendment which had been acted upon by the Convention on April 30, 1912.

At no place in the proceedings and debates did we find any proposals providing for any municipal appropriation procedures other than those which were existing and in effect previous to said Convention; nor does it appear that the majority, in adopting the proposed Home Rule Amendment, contemplated that any new or other than the existing procedures would be necessary or required.

And, at no place in the proceedings and debates did we find any remarks, on the part of either the proponents or the opponents, tending to show or indicate that the adoption of the proposed Home Rule Amendment would have the force and effect of repealing the then existing Section 3677 (13), General Code, or any of its related sections and which are now embodied in Chapter 719, Revised Code.

And, upon due consideration of each and all of these factors, this court is compelled to conclude that the proposal and adoption of Sections 4 and 5 of the Home Rule Amendment (Article XVIII, Ohio Constitution), did not contemplate and was not intended to repeal any part or portion of the statutory provisions contained in the pre-existing Section 3677 (13), General Code, or any of its related Sections of the General Code and which are presently embodied in Chapter 719, Revised Code.

Research of numerous court decisions relating to various sections of Ohio's Home Rule Amendment, over a period of nearly fifty years since its adoption, reflects and repeats the use and application of such terms and phrases as:—"permissive," "self-executing," "exclusive delegation of power," "grant of power," "plenary power," and other similar terms and phrases.

And, upon noting the apparent lack of uniformity in the reasoning and rational accorded by the various court decisions in arriving at the particular judgment rendered concerning those cases involving various sections and provisions of Article XVIII, we cannot disregard or ignore one basic and prevailing rule of law which was the doctrine announced in *Cass* v. *Dillon,* 2 Ohio St., 607.

In the following paragraphs of the syllabus, in *Cass* v. *Dillon, supra,* the Supreme Court of Ohio declared the doctrine to be:—

"The laws of a conquered country being held to remain in force until repealed, so far as they are consistent with the government of the conquerors, *a fortiori* must it be held, that the laws of a State survive a peaceable change of its constitution, effected by its own people, and not varying the general structure of the government, to the full extent to which they are consistent with the new order of things.

"The new Constitution of Ohio created no new State. It only altered, in some respects, the fundamental law of a State already in existence; and even this was done pursuant to the prior constitution, under whose provisions the convention was called, and the new constitution framed.

"It follows, that all laws in force when the latter took effect, and which were not inconsistent with it, would have remained in force without an express provision to that effect; and all inconsistent laws fell simply because they were inconsistent; in other words, all repugnant laws were repealed by implication.

"The rule, that repeals by implication are not favored, is applicable to the enquiry; whether any particular enactment has ceased to be in force on account of repugnancy to the new constitution. *Ohio, ex rel. Evans,* v. *Dudley,* 1 Ohio St., 437, approved.

"The repugnancy which must cause the law to fall, must

be necessary and obvious; if by any fair course of reasoning, the law and the constitution can be reconciled, the law must stand.

"* * *

"While we should be careful not to extend the powers of government, by far fetched implication, we should be equally careful not to defeat the purpose of the constitution, by a narrow and unreasonable construction.

"The constitution did not create the municipalities of the State, nor does it attempt to enumerate their powers. It recognizes them as things already in being, with powers that will continue to exist, so far as they are consistent with the organic law, until modified or repealed."

It does not appear that the rules of law and doctrine so declared and pronounced, in *Cass* v. *Dillon, supra,* have been overruled. As recently as 1955, in *State, ex rel. Dickman,* v. *Defenbacher,* 164 Ohio St., 142, at page 146, it was cited with approval.

Defendants' brief does not dispute plaintiff's contention that no enabling legislation was enacted, since the adoption of Sections 4 and 5 of Article XVIII, to implement and prescribe all of the procedures to be followed by a municipality in condemning a public utility. Under the doctrine and principles of law declared and pronounced in *Cass* v. *Dillon, supra,* no such enabling legislation was necessary or required, because the Supreme Court of Ohio has declared the law to be that the statute law, which was in force and effect at the adoption and effective date of the Home Rule Amendment and which was not inconsistent with or repugnant to said amendment, clearly remains in force and effect until repealed.

Plaintiff cannot deny and therefore must concede that the municipal appropriation statutes, in force and effect today, are the same, in substance and effect, as those which were in force and effect when Sections 4 and 5 of Article XVIII were adopted and became effective in 1912; and that said statutes still prescribe the same procedures to be followed and still designate and confer jurisdiction upon the same courts therein named. Therefore, applying the rules of law so pronounced in *Cass* v. *Dillon, supra,* to the issues raised by defendants' demurrer to plaintiff's first amended petition, it clearly appears that there

is no inconsistency or repugnancy between the procedural provisions of Chapter 719, Revised Code, and the provisions of Sections 4 and 5 of Article XVIII; that there is no justiciable issue concerning the municipality's resolution of intent; that there is no genuine controversy or doubt which would entitle plaintiff to a declaratory judgment as prayed for; and that defendants' demurrer to plaintiff's petition for declaratory judgment should be sustained.

Before passing on to consider plaintiff's petition for injunctive relief, the court deems it worthy of mention that, in arriving at its conclusions hereinabove set forth, the court has not followed the reasoning of the court of appeals in the case of *Ohio Water Service Co.* v. *Circleville, supra,* but nevertheless has arrived at the same result and the identical conclusion stated and set forth in paragraph 3 of the headnotes in the *Circleville case;* and this court subscribes to the rule of law so stated in said paragraph 3 as if fully rewritten herein.

And the court, coming now to consider all of the allegations contained in plaintiff's first amended petition whereby plaintiff seeks and claims it is entitled to injunctive relief, and giving thereto a liberal construction most favorable to the plaintiff, by indulging every reasonable inference from said allegations, must also consider plaintiff's express and specific admission that defendants' resolution of intent (to appropriate all of the right, title, and interest of the Ohio Water Service Company in all of the physical properties and assets presently owned or used by said company in the supply of water to the City of Washington and its inhabitants) was duly adopted pursuant to the provisions of Section 719.04, Revised Code.

And plaintiff also admits that, subsequent to the adoption of said resolution of intent, defendants caused appropriate notice to be given to plaintiff and other persons in possession of or having an interest of record in any of the premises or property specifically described in said resolution; and that, since the passage of said resolution, plaintiff further claims it has made additions and extensions to its system in the normal and regular course of its operation and it will be necessary for it to continue to do so in order that it may discharge its legal duties as a public utility.

It is a matter of common knowledge that such a resolu-

tion of intent does not constitute the act of exercising the appropriation of property under either the provisions of Section 719.04, Revised Code, or Sections 4 or 5 of Article XVIII; and that plaintiff's property would be appropriated only when the legislative authority of the City of Washington has enacted an appropriation ordinance pursuant to and in compliance with the provisions of Section 5, Article XVIII (and the appropriate provisions of Section 719.05, Revised Code, which are consistent with and not repugnant to Section 5 of said Article XVIII); and that the property described and designated in the appropriation ordinance, rather than the property described in the prior resolution of intent, would constitute the utility's property so appropriated; and, therefore, such additions and extensions so made by a utility subsequent to a resolution of intent and prior to the enactment of an appropriation ordinance, as alleged in plaintiff's first amended petition, would not state an action for injunctive relief to enjoin a municipality from enacting such a subsequent appropriation ordinance so complained or by plaintiff.

It is also a matter of common knowledge that the Public Utilities Commission of Ohio is without authority or jurisdiction to enforce rules and regulations of extensions and additions of service upon a utility which has been condemned by an appropriation ordinance pursuant to Chapter 719, Revised Code and Section 5 of Article XVIII as hereinabove cited and referred to; and, therefore, as a matter of law, plaintiff utility would not be subject to its usual and ordinary duties to provide extensions and additions of its service after the enactment of such an appropriation ordinance by defendants, and for the same reason would not be entitled to enjoin the enactment of such an appropriation ordinance.

Plaintiff further alleges and claims that, unless enjoined, the defendants will continue to follow the procedures prescribed in Section 719.04, and subsequent Sections of Chapter 719, Revised Code, with respect to appropriating plaintiff's properties described in said resolution of intent and with respect to the assessment of the compensation to be paid therefor; and that its aforesaid additions and extensions to its system will be rendered substantially valueless if the defendants are not enjoined with respect to appropriating plaintiff's property pur-

suant to the provisions of Chapter 719, Revised Code. As hereinabove discussed, such claims of the plaintiff are without merit and fail to state an action which would entitle plaintiff to the injunctive relief prayed for.

And, it is noted that, in the second sentence of numbered paragraph "(10)" of its first amended petition, plaintiff alleges as follows:

"(10) * * * Said resolution, together with the acts of the defendants taken and to be taken pursuant thereto, under the alleged authority of Chapter 719, Revised Code, constitutes and will constitute an unwarranted and illegal interference with the plaintiff's ownership and operation of its properties as a public utility in the City of Washington in that they prejudice the plaintiff's ability to obtain needed financing for its operation and for the construction of additions and improvements; they create problems in the collection of plaintiff's accounts; they interfere with the plaintiff's internal operations; and they make it impossible for plaintiff to make rational determinations as to whether and to what extent plaintiff should expend funds for additions to enable it to furnish adequate service to the public; all of which will result in irreparable harm and damage to the plaintiff and to those dependent upon the plaintiff for water service and fire protection."

By these allegations so stated and set forth, plaintiff has enumerated clearly and concisely the problems which come to each and every utility which is subjected to appropriation as provided by the constitution and statute law of Ohio. And, under the rules of law declared and pronounced in *Cass* v. *Dillon, supra,* as hereinabove cited and discussed, plaintiff's allegations so made and set forth are without foundation in fact or law which could or would entitle plaintiff to the injunctive relief prayed for in its first amended petition.

And, for the reasons and upon the authorities hereinabove stated and set forth, this court is compelled to conclude that defendants' demurrer to plaintiff's first amended petition, as to each and all of the allegations contained therein and with respect each cause of action purported to be alleged therein, is well made and should be sustained.

The court will forthwith prepare an appropriate entry in conformity herewith and noting therein plaintiff's exceptions thereto.